# United States Court of Appeals
# for the Federal Circuit

_____

(Serial No. 77/254,637)

**IN RE BECTON, DICKINSON AND COMPANY**

_____

2011-1111

_____

Appeal from the United States Patent and Trademark Office, Trademark Trial and Appeal Board.

_____

Decided: April 12, 2012

_____

RICHARD Z. LEHV, Fross, Zelnivk, Lehrman & Zissu, of New York, New York, argued for the appellant.

CHRISTINA J. HIEBER, Associate Solicitor, United States Patent and Trademark Office, of Alexandria, Virginia, argued for the appellee. With her on the brief was RAYMOND T. CHEN, Solicitor. Of counsel was AMY NELSON.

_____

Before BRYSON, CLEVENGER, and LINN, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* CLEVENGER.

Dissenting opinion filed by *Circuit Judge* LINN.

CLEVENGER, *Circuit Judge.*

Becton, Dickinson and Company ("BD") appeals from the final decision of the Trademark Trial and Appeal Board ("Board") affirming the examining attorney's refusal to register BD's design of a closure cap for blood collection tubes as a trademark on the ground that the design is functional. BD also appeals the Board's determination that the mark has not acquired distinctiveness. We need not reach the issue of acquired distinctiveness. Even if the mark had acquired the requisite distinction, it fails registrability because we affirm the Board's conclusion that the mark as a whole is functional.

I

BD applied to register with the United States Patent and Trademark Office ("PTO") the following mark on the Principal Register for "closures for medical collection tubes":



U.S. Trademark Application Serial No. 77/254,637 (filed August 14, 2007). The application asserts acquired distinctiveness based on five years of substantially exclusive

and continuous use in commerce. The required descrip-
tion of the mark, as amended, reads as follows:

> The mark consists of the configuration of a
> closure cap that has [1] an overall stream-
> lined exterior wherein the top of the cap is
> slimmer than at the bottom and the cap
> features [2] vertically elongated ribs set
> out in combination sets of numerous slim
> ribs bordered by fatter ribs around most of
> the cap circumference, where [3] a smooth
> area separates sets of ribs. [4] The slim
> ribs taper at their top to form triangular
> shapes which intersect and blend together
> at a point where [5] a smooth surface area
> rings the top of the cap above the ribs,
> thus [6] extending the cap's vertical pro-
> file. At the bottom, [7] a flanged lip rings
> the cap and protrudes from the sides in
> two circumferential segments with the
> bottom-most segment having [8] a slightly
> curved contour. The matter in dotted
> lines is not claimed as a feature of the
> mark, but shows the tube on which the
> closure is positioned.

The numbers in brackets in the description above are not
part of the trademark application, but were used by BD in
conjunction with the following illustration to illustrate
key features of the mark:



The examining attorney refused registration under 15 U.S.C. § 1052(e)(5) on the basis that the cap design is functional and on the basis that even if non-functional, the cap design is a non-distinctive configuration of the goods under 15 U.S.C. §§ 1051-1052 and 1127. She further found BD's declaration insufficient to show acquired distinctiveness under 15 U.S.C. § 1052(f).

As part of the initial office action, the examining attorney also issued a request for additional information pursuant to 37 C.F.R. § 2.61 and required BD to provide information concerning the cap design, including: whether it is or has been the subject of either a utility or design patent application; samples of advertising, promotional, and/or explanatory materials concerning the cap design; evidence regarding the availability of alternative designs; designs used by competitors; and whether the design results from a comparatively simple or inexpensive method of manufacture. In response, BD submitted several of its utility and design patents, samples of advertising materials, and copies of website printouts showing medical closure caps manufactured by other entities. Specifically, BD provided these patents in response to the information requirement: U.S. Patent No. 4,741,446 (filed Dec. 29, 1986) ("the '446 patent"); U.S. Patent No.

4,991,104 (filed Mar. 19, 1990); U.S. Patent No. 6,602,206 (filed Aug. 16, 2000); U.S. Patent No. D356,643 (filed May 27, 1993); U.S. Patent No. D357,985 (filed May 27, 1993); and U.S. Patent No. D445,908 (filed Aug. 6, 1999). BD also submitted numerous advertising samples for its VACUTAINER® collection tubes with HEMOGARD™ closure—the brand name of the closure cap for which BD seeks registration. Additionally, BD reasserted that the cap design has acquired distinctiveness and submitted the declaration of BD's chief intellectual property counsel with exhibits in support of that claim.

The examining attorney issued a final refusal, and BD filed a Notice of Appeal to the Board, while simultaneously filing a Request for Reconsideration. With its reconsideration request, BD submitted declarations from two of its product designers in support of its argument that the cap design is not functional. BD also submitted eleven customer declarations in support of its argument that the cap design has acquired distinctiveness. The examining attorney denied BD's reconsideration request, and the appeal proceeded.

After briefing of the appeal was completed but before a hearing, BD filed a second Request for Reconsideration and proposed the more detailed mark description stated above, which the examining attorney accepted. BD filed a supplemental reply brief, and the Board held an oral hearing on April 1, 2010. The Board found that the proposed mark is a configuration of the outer shell portion of BD's HEMOGARD™ collection tube closure caps. *In re Becton, Dickinson & Co.*, No. 77254637, 2010 WL 3164746, at \*2 (T.T.A.B. July 27, 2010) ("*Board Opinion*"). BD argued that its amended mark description and a numbered illustration in its reply brief set out the features of the cap design, but the Board explained that the features described in the amended description do not

embody the mark in its entirety. *Id.* at \*1-2. The Board saw additional elements not recited in the mark description, including the circular opening on the top of the cap. *Id.* at \*2. Thus, the Board concluded that the proposed mark included all elements shown in the drawing except the tube, which was shown in dotted lines. *Id.*

The Board considered the four factors from *In re Morton-Norwich Prods., Inc.*, 671 F.2d 1331 (CCPA 1982), in finding that the cap design, considered in its entirety, is functional. The Board found that the first factor–the existence of a utility patent (e.g., the '446 patent) disclosing the utilitarian advantages of the design sought to be registered–weighed in favor of finding the cap design functional. The Board found that the '446 patent explained the utilitarian advantages of at least two prominent features of the cap design, namely, the circular opening and the ribs. *Board Opinion*, 2010 WL 3164746, at \*4-5.

The second factor—advertising by the applicant that touts the utilitarian advantages of the design—also weighed in favor of a functionality finding. The Board agreed with the examining attorney that several parts of BD's advertising "extol the utilitarian advantages of several design features of the proposed mark," including (1) the ridges on the side of the cap that allow for a more secure grip, (2) the flanged lip at the bottom that inhibits the handler's ability to roll their thumb to pop off the cap, thereby reducing the risk of splattering, and (3) the hooded feature of the cap whereby the bottom of the cap extends over the top of the tube and thus prevents the user's gloves from getting pinched between the stopper and tube when closing the tube. *Id.* at \*6.

Next, the Board considered the third factor, assessing whether the cap design results from a comparatively

simple or inexpensive method of manufacture. With little argument or evidence on this factor, the Board found that it did not favor a finding of functionality. *Id.* Finally, the Board considered the fourth factor, regarding the availability of alternative designs, and found that "the record does not establish that there are alternative designs for collection tube closure caps." The Board considered BD's evidence: website printouts featuring three third-party collection tube products. The Board found one product did not perform the same function as BD's goods and therefore was not relevant. Regarding the two remaining third-party products, the Board found them difficult to characterize as alternative designs because they shared the same utilitarian features as BD's cap design, including ribs on the side to allow for a better grip and an opening on the top, rather than discernible contrasting features. *Id.* at *7.

Thus, the Board concluded that "the closure cap configuration mark, considered in its entirety, is functional." *Id.* at *4. In conducting the analysis, the Board gave less weight to less prominent features, such as the exact spacing or shape of the ribs, because it found them to be incidental to the overall adoption of those features and hardly discernible when viewing the mark. *Id.* at *8. In this regard, the Board relied on *Textron, Inc. v. International Trade Commission*, 753 F.2d 1019, 1025 (Fed. Cir. 1985), for the proposition that presence of non-functional features in a mark would not affect the functionality decision where the evidence shows the overall design to be functional. The Board concluded that the overall design is dictated by utilitarian concerns and that the "'overall composite design' engendered by [BD's] proposed mark is functional." *Board Opinion*, 2010 WL 3164746, at *8. The Board in addition found that even if the cap design was not functional, BD had not met its burden to estab-

lish acquired distinctiveness, and so would not be permitted registration, in any event. *Id.* at *9-12.

On October 26, 2010, BD filed a timely notice of appeal. This court has jurisdiction over this ex parte appeal of a final decision of the Board pursuant to 28 U.S.C. § 1295(a)(4)(B) and 15 U.S.C. §1071(a)(1).

## II

The functionality of a proposed mark is a question of fact. *In re Bose Corp.*, 476 F.3d 1331, 1334 (Fed. Cir. 2007); *Valu Eng'g, Inc. v. Rexnord Corp.*, 278 F.3d 1268, 1273 (Fed. Cir. 2002); *Morton-Norwich*, 671 F.2d at 1340. Likewise, distinctiveness and acquired distinctiveness are questions of fact. *In re Slokevage*, 441 F.3d 957, 959 (Fed. Cir. 2006); *In re Loew's Theaters, Inc.*, 769 F.2d 764, 769 (Fed. Cir. 1985).

Legal conclusions of the Board are reviewed de novo, but the factual findings of the Board are upheld unless they are unsupported by substantial evidence. *In re Pacer Tech.*, 338 F.3d 1348, 1349 (Fed. Cir. 2003). Evidence is substantial if a "reasonable person might find that the evidentiary record supports the agency's conclusion." *On-Line Careline, Inc. v. Am. Online, Inc.*, 229 F.3d 1080, 1085 (Fed. Cir. 2000). The possibility that two inconsistent conclusions may be drawn from the evidence does not preclude a Board finding from being supported by substantial evidence. *Id.* at 1086. Rather, where contradictory conclusions may reasonably be drawn from the evidence, the decision of the Board favoring one conclusion over the other is the type of finding that must be sustained as supported by substantial evidence. *In re Bayer Aktiengesellschaft*, 488 F.3d 960, 970 (Fed. Cir. 2007); *In re Jolley*, 308 F.3d 1317, 1329 (Fed. Cir. 2002).

### III

BD presents two challenges to the Board's conclusion that the mark as a whole is functional. Its lead argument posits legal error by the Board in its determination that certain features of the mark, which are admittedly non-functional, will not serve to remove the mark as a whole from the realm of functionality. BD asserts that the elongated shape of the closure cap, the spacing of the ribs and their particular shapes, as well as the design relationship of those features to the whole of the closure cap are the design embraced by the mark. As such, BD asserts that the scope of its mark is "extremely modest and limited." *Appellant Br.* 2, 10. BD does not contest that the ribs themselves are functional, as is the opening in the top of the closure cap. These prominent and important functional features, which are common to the closure caps made by BD's competitors, led the Board to conclude that admitted non-functional features could not save the mark from being deemed overall functional. BD contends that the Board committed reversible error by discounting the significance of the non-functional elements.

BD's secondary argument is that the Board's analysis of the *Morton-Norwich* factors is unsupported by substantial evidence. BD appreciates the more deferential standard of review we apply to its second argument.

### A

BD's first argument fails to recognize that one object of the *Morton-Norwich* inquiry is to weigh the elements of a mark against one another to develop an understanding of whether the mark as a whole is essentially functional and thus non-registrable. Whenever a proposed mark includes both functional and non-functional features, as in this case, the critical question is the degree of utility present in the overall design of the mark. This court

recognized as much in *Morton-Norwich*, 671 F.2d at 1338, where Judge Rich harked back to the design in *In re Deister Concentrator Co.*, 289 F.2d 496, 506 (CCPA 1961), in which the design was judged "in essence utilitarian." In *In re R.M. Smith, Inc.*, 734 F.2d 1482, 1484 (Fed. Cir. 1984), this court reiterated the importance of the "degree of utility" proposition, and explained how the distinction between de facto and de jure functionality gives shape to a court's inquiry into a mark's "degree of utility."

De facto functionality simply means that a design has a function, like the closure cap in this case. Such functionality is irrelevant to the question of whether a mark as a whole is functional so as to be ineligible for trademark protection. De jure functionality "means that the product is in its particular shape because it works better in this shape." *Id.* Further, as the Board recognized in this case, *Textron* instructs that where a mark is composed of functional and non-functional features, whether "an overall design is functional should be based on the superiority of the design as a whole, rather than on whether each design feature is 'useful' or 'serves a utilitarian purpose.'" 753 F.2d at 1026. *Textron* cited as an example the Coca-Cola® bottle, noting that the bottle's significant overall non-functional shape would not lose trademark protection simply because "the shape of an insignificant element of the design, such as the lip of the bottle, is arguably functional." Id. at 1027. Likewise, a mark possessed of significant functional features should not qualify for trademark protection where insignificant elements of the design are non-functional.

The foregoing authority makes clear that the Board committed no legal error by weighing the functional and non-functional features of BD's mark against each other. Our functionality precedent indeed mandates that the Board conduct such an assessment as part of its determi-

nation of whether a mark in its entirety is overall de jure functional. As the court explained in *Morton-Norwich*, "we must strike a balance between the 'right to copy' and the right to protect one's method of trade identification." 621 F.2d at 1340. To decide as a matter of fact "whether the 'consuming public' has an interest in making use of [one's design], superior to [one's] interest in being [its] sole vendor," we are guided by the *Morton-Norwich* factors. *Id.* (citation omitted).

## B

To support a functionality rejection in proceedings before the Board, the PTO examining attorney must make a prima facie case of functionality, which if established must be rebutted by "competent evidence." *In re Teledyne Indus.*, 696 F.2d 968, 971 (Fed. Cir. 1982). Given the burden of proof in other areas of trademark law and given the context here, we understand the "competent evidence" standard as requiring proof by preponderant evidence. *See, e.g.*, *Yamaha Int'l Corp. v. Hoshino Gakki Co,* 840 F.2d 1572, 1576 (Fed. Cir. 1988) (in an inter partes opposition before the Board, the opposer has the initial burden to present prima facie evidence that the mark has not acquired distinctiveness, and then burden shifts to the applicant to prove acquired distinctiveness by a preponderance of the evidence); *Cold War Museum, Inc. v. Cold War Air Museum, Inc.*, 586 F.3d 1352, 1356 (Fed. Cir. 2009) (petitioner in a cancellation proceeding bears the burden of proof and must overcome the registration's presumption of validity by a preponderance of the evidence).

In this case, the Board sustained the examining attorney's prima facie determination of functionality, and rejected BD's attempt to overcome that determination. As noted above, the Board did so by conducting its assess-

ment of BD's proposed mark under the familiar *Morton-Norwich* factors:

> (1) the existence of a utility patent disclosing the utilitarian advantages of the design; (2) advertising materials in which the originator of the design touts the design's utilitarian advantages; (3) the availability to competitors of functionally equivalent designs; and (4) facts indicating that the design results in a comparatively simple of cheap method of manufacturing the product.

*Valu Eng'g*, 278 F.3d at 1274 (citing *Morton-Norwich*, 671 F.2d at 1340-41).

BD challenges the Board's ultimate factual determination that the mark as a whole is functional by homing in on the Board's *Morton-Norwich* analysis, arguing that the Board's analysis lacks substantial evidence support. As to the first *Morton-Norwich* factor, the Board did not err in finding that this factor weighs in favor of finding functionality. In *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 31 (2001), the Supreme Court stated that "the disclosure of a feature in the claims of a utility patent constitutes strong evidence of functionality." As discussed by the Board, claim 4 of the '446 patent shows the utilitarian nature of at least two prominent features of BD's mark: (1) the two concentric circles at the top of the closure cap, which allow a needle to be inserted, and (2) the ribs, which serve as a gripping surface.

BD does not contest the Board's finding that the '446 patent teaches the functional benefits of two important features of its proposed mark. Rather it argues that those features, while disclosed in the '446 patent, were not themselves claimed in that patent. BD's argument lacks

merit. *TrafFix* does not require that a patent claim the exact configuration for which trademark protection is sought in order to undermine an applicant's assertion that an applied-for mark is not de jure functional. Indeed, *TrafFix* teaches that statements in a patent's specification illuminating the purpose served by a design may constitute equally strong evidence of functionality. *See TrafFix*, 532 U.S. at 32-33, 34-35. The Board correctly read the '446 patent to indicate that at least two of the important elements of the proposed mark were functional.

BD argues that its design patents are persuasive evidence of the non-functionality of the closure caps' overall design. However, while evidence of a design patent may be some evidence of non-functionality under *Morton-Norwich*, "the fact that a device is or was the subject of a design patent does not, without more, bestow upon said device the aura of distinctiveness or recognition as a trademark." *R.M. Smith*, 734 F.2d at 1485 (citation omitted). Furthermore, the design patents BD claims as evidence of non-functionality do not reflect the specific design for which trademark protection is sought. Our law recognizes that the existence of a design patent for the very design for which trademark protection is sought "presumptively . . . indicates that the design is *not de jure* functional." *Morton-Norwich*, 671 F.2d at 1342 n.3. Absent identity between the design patent and the proposed mark, the presumption loses force, and the "similar" design patents lack sufficient evidentiary value to overcome the strong conclusion in this case that BD's utility patents underscore the functionality of significant elements of the proposed mark.

As to the second *Morton-Norwich* factor, substantial evidence supports the Board's assessment of BD's advertising. BD's advertising touts the utilitarian advantages of the prominent features of the mark, such as the top's

circular opening (which maximizes the possible useful area of the opening), the side's ribs, and the bottom's flanged lip. The advertisements emphasize that the "ridges on the outer surface permit for a more secure grip," and praise the "enhanced handling features" that are "inherent in the design." The advertisements explain that the top's "plastic shield" is an "important design innovation that keeps the blood safely contained within the closure" and "encourages safer opening–discourages use of the thumb roll technique, which can result in spattering of the specimen," and that the "hooded feature of closure reduces the possibility of catching glove between stopper and tube on reclosing." Against this substantial evidence of functionality, BD offers two explanations, each of which we reject. First, BD argues that the designs shown in the advertisements are not exactly the same as the proposed mark's design. For purposes of an overall functionality assessment, this distinction is without a difference. While the spire-like tops of the ribs may not be shown in the advertisements, the arrangement of the ribs along the side of the top and the shape of the opening are sufficiently like the features of the claimed mark to show an identity of functionality between the articles shown in the advertising and the proposed mark's prominent features. Second, BD would characterize the advertisements as "look for" advertising—the kind that pulls out of an overall article a few features to catch the viewer's attention. Thus BD argues that its advertisements were not really intended to tout functional aspects of its design, but merely to cause the viewer to look at one part of a design in particular. This argument fails. Nothing in the text of the advertisements underscores this "look for" concept. Instead the advertisements taken as a whole are more than substantial evidence that the proposed mark as a whole is functional.

Indeed, the enlarged photographs of parts of the device actually highlight the functional aspects of the mark.

As to the third factor, if functionality is found based on other considerations, there is "no need to consider the availability of alternative designs, because the feature cannot be given trade dress protection merely because there are alternative designs available." *Valu Eng'g*, 278 F.3d at 1276. Thus, since the patent and advertising evidence established functionality, the Board did not need to analyze whether alternative designs exist. Nonetheless, the Board did conduct this analysis and found that one of the proposed designs was irrelevant and the other two could not be characterized as alternative designs because they shared the same utilitarian features of BD's design. BD has not shown that this finding is unsupported by substantial evidence.

Finally, as to the fourth factor, there was little record evidence before the Board to establish whether the cap design results from a comparatively simple or inexpensive method of manufacture. The sole evidence in the record on this factor consists of the declarations of Jaeger and Newby, two BD witnesses, who both averred that the design features did not lower the cost of manufacture. Given this scarce evidence, the Board did not err in refusing to weigh this factor in its analysis.

In *New England Butt Co. v. International Trade Commission*, 756 F.2d 874 (Fed. Cir. 1985), we explained that the public policy underlying the rule that de jure functional designs cannot be protected as trademarks is "not the *right* to slavishly copy articles which are not protected by patent or copyright, but the *need* to copy those articles, which is more properly termed the right to compete *effectively*." *Id.* at 877 (citing *Morton-Norwich*, 671 F.2d at 1339). The record in this case shows that

BD's competitors in the closure cap industry also feature ribs for sure gripping and similar functional openings on their products. The Board thus concluded that the record failed to establish that there are meaningful alternative designs for collection tube closure caps. *Board Opinion*, 2010 WL 3164746, at *8. Substantial evidence supports this conclusion, which underscores the competitive need to copy the functional features of BD's proposed mark.

Because the Board committed no legal error in its assessment of the functionality of BD's proposed mark, and because substantial evidence supports the Board's findings of fact under the *Morton-Norwich* factors, we affirm the final decision of the Board.

## AFFIRMED

### COSTS

Each party shall bear its own costs.

# United States Court of Appeals for the Federal Circuit

---

**IN RE BECTON, DICKINSON AND COMPANY**

---

2011-1111

---

Appeal from the United States Patent and Trademark Office, Trademark Trial and Appeal Board in application Serial No. 77/254,637.

---

LINN, *Circuit Judge*, dissenting.

Because the Trademark Trial and Appeal Board ("Board") incorrectly applied the legal standards in assessing the functionality of the trademark of Becton, Dickinson and Company ("BD"), and because substantial evidence does not support the Board's conclusion of functionality, I respectfully dissent.

It is undisputed that certain individual features of BD's closure cap design are functional, but the evidence falls short in supporting a conclusion that the mark, as a whole and as shown in the drawing, is in essence utilitarian, and thus *de jure* functional. While various individual features of a mark may be *de facto* functional if they are directed to the performance of certain identified functions, *In re Morton-Norwich Prods., Inc.*, 671 F.2d 1332, 1337 (CCPA 1982), *de jure* functionality is directed to the *appearance* of the design (*not* the thing itself) and is concerned with whether the design is "made in the form it

must be made if it is to accomplish its purpose"—in other words, whether the appearance is dictated by function. *Morton-Norwich*, 671 F.2d at 1338-39 (internal citation omitted); *see TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 33 (2001) ("[A] feature is . . . functional when it is essential to the use or purpose of the device or when it affects the cost or quality of the device.") (citing *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159 (1995) and *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844 (1982)).

I agree with the majority that the degree of design utility must be considered in determining *de jure* functionality. Maj. Op. at 9-10 (citing *Morton-Norwich*, 671 F.2d at 1338). I part company with the majority, however, when it approves the Board's "weigh[ing] the elements of a mark against one another to develop an understanding of whether the mark as a whole is essentially functional and thus non-registrable." Maj. Op. at 9. The presence of functional features may be relevant, but not in the sense of comparing dissociated functional features against non-functional features. The proper inquiry is to examine the degree to which the mark as a whole is dictated by utilitarian concerns (functional or economic superiority) or is arbitrary ("without complete deference to utility"). *See Morton-Norwich*, 671 F.2d at 1338-39, 1342-43.

Weighing individual elements of a mark against each other is analytically contrary to the consideration of the mark as a whole. As this court has previously held, "[s]imply dissecting appellant's alleged trademark into its design features and attributing to each a proven or commonly known utility is not, without more, conclusive that the design, considered as a whole, is de jure functional and not registrable." *In re Teledyne Indus., Inc.*, 696 F.2d 968, 971 (Fed. Cir. 1982).

This court's decision in *Morton-Norwich* is instructive. Morton-Norwich sought to register the following design:



671 F.2d at 1334. The examining attorney rejected the mark on the basis that the design "is no more than a non-distinctive purely functional container for the goods plus a purely functional spray trigger controlled closure . . . essentially utilitarian and non-arbitrary." *Id.* at 1335. The Board similarly concluded that the mark "is dictated primarily by functional (utilitarian) considerations, and is therefore unregistrable." *Id.* (original emphasis omitted).

Our predecessor court reversed finding that the applicant sought to register "no single design feature or component but the overall composite design comprising both bottle and spray top." *Id.* at 1342. Thus, the degree of design utility was analyzed for the whole mark, not the dissociated functional elements. Although the bottle and spray top each served a function, there was a complete absence of evidence to show that the shape of the bottle and spray top were required to look as they did to serve those functions. *Id.* Indeed, the evidence before the Board established that the bottle and spray top could take a number of diverse forms, equally as suitable from a functional standpoint. *Id.* The court concluded that there would be no injury to competition if Morton-Norwich were entitled to protection of this particular design; competitors could obtain the functions of the container without copying the trade dress. *Id.* at 1342-43. In sum, the

evidence failed to prove that the overall design was "the best or one of a few superior designs available." *Id.* at 1341.

The facts in the present case are very much like those in *Morton-Norwich*. BD seeks protection of the following mark, with the matter in dotted lines not claimed as a feature:



As in *Morton-Norwich*, there is no evidence that the overall design of the BD closure cap is required to look the way it does or that the design is "the best or one of a few superior designs available." *Id.* at 1341-42. The Board and the majority place principal focus on the function served by certain features of the mark, including, *inter alia*, the top's opening (to allow for the insertion of a needle), the ribs on the side of the cap (to allow for in-

creased grip), and the bottom's flanged lip (to allow for a safer opening). These considerations relate to the *de facto* functionality of individual product features and not the *de jure* functionality of the overall design—whether the design as a whole must look this way to serve some identified function. In focusing on the functional attributes of individual components, the Board and the majority overlook the arbitrary nature of BD's overall design.

Even under the improper analysis accepted by the majority, if the individual attributes with recognized functions are examined, there is no support for the proposition that the form of those components was dictated by their function. There is no evidence that: (1) the hole in the top *must* be that particular shape and size for a needle to pass through the opening; (2) the side of the cap *must* possess horizontally spaced ribs in the precise shape, size, and spacing depicted in BD's design to provide for increased grip; or (3) the bottom lip *must* be flanged and tapered in the precise manner depicted to avoid being unsafe.

While the proposed mark must be examined as a whole, evidentiary concerns allow the Patent and Trademark Office ("PTO") to establish a prima facie case of functionality by analyzing *de facto* functional features of a design. *Teledyne*, 696 F.2d at 971 ("We recognize that in most cases . . . the best the PTO can probably do is to analyze a design from the standpoint of its de facto functional features."); *Textron, Inc. v. U.S. Int'l Trade Comm'n,* 753 F.2d 1019, 1026 (Fed. Cir. 1985) (following *Teledyne*, 696 F.2d at 971); *see In re R.M. Smith, Inc.*, 734 F.2d 1482, 1484 (Fed. Cir. 1984) (following *Teledyne*, 696 F.2d at 971). The burden then shifts to the applicant to rebut the prima facie case of functionality. *Teledyne*, 696 F.2d at 971 ("Determination that the design as a whole is not de jure functional may well be possible only in light of evidence more readily available to, or uniquely in the

possession of, the applicant."). However, the ultimate determination of *de jure* functionality still requires a consideration of the design as a whole. *Id.*; *Textron*, 753 F.2d at 1026 (following *Teledyne*, 696 F.2d at 971).

Here, the examiner focused on functional features to establish a prima facie basis for the rejection and BD, in turn, submitted evidence on functionality to rebut that rejection. While the Board and the majority correctly cite the *Morton-Norwich* factors to determine the functionality of the overall design based on the evidence presented, Maj. Op. at 11-12 (quoting *Valu Eng'g, Inc. v. Rexnord Corp.*, 278 F.3d 1268, 1274 (Fed. Cir. 2002)); *In re Becton, Dickinson & Co.*, No. 77254637, 2010 WL 3164746, at *4 (T.T.A.B. July 27, 2010) ("*Board Opinion*") (citing *Morton-Norwich*, 671 F.2d), both the Board and the majority fail to consider the design as a whole in analyzing these factors. Maj. Op. at 12-15; *Board Opinion*, 2010 WL 3164746, at *4-8.

First, while the Board and the majority put great weight in the existence of a utility patent, U.S. Patent No. 4,741,446 ("the '446 Patent"), that patent fails to illuminate the functionality inquiry. The Supreme Court recognized that "[a] utility patent is strong evidence that the features therein claimed are functional." *TrafFix*, 532 U.S. at 29 (2001). However, the '446 Patent claims none of the features of BD's design mark. Specifically, the claims of the '446 Patent do not cover the appearance or pattern of the ridges, the flanged lip, or the top opening of BD's design. *See* '446 Patent col.8 ll.23-29 ("(f) a flexible cap body for mounting on said stopper body; (g) said cap body having an open end and a substantially closed end; . . . (i) said closed end having a needle receiving bore in the top surface thereof . . . .").

Second, the majority correctly notes that the advertisements tout the features of BD's design that serve a

functional purpose, which weighs against a finding of non-functionality. Maj. Op. at 13-14. However, the advertisements do support the finding of non-functionality based on the third *Morton-Norwich* factor: the presence of alternative designs. While the majority finds no relevance in the fact that the designs featured in BD's advertisements were not exactly the same as the current mark, *see id.*, this fact indicates the existence of alternative designs that are nonetheless functionally identical.

Addressing the third *Morton-Norwich* factor, the Board and the majority discounted the most probative evidence submitted in this case—the design patents and evidence of alternative designs. Because "the effect upon competition is really the crux of the matter, it is, of course, significant that there are other alternatives available." *Morton-Norwich*, 671 F.2d at 1341 (internal quotation omitted).

The three design patents noted by the majority are not identical to the specific design for which trademark protection is sought. Maj. Op. at 13. However, the fact that three distinct design patents were granted on similar, but not identical, designs performing the same overall function as the current design at issue suggests that the current design is not "made in the form it must be made if it is to accomplish its purpose." *Morton-Norwich*, 671 F.2d at 1339 (internal citation omitted). If a design patent can show that one design in a group of functionally identical alternative designs is non-functional, the entire class of arbitrary alternative designs is likely non-functional.

Moreover, the court in *Morton-Norwich* noted that the presence of a design patent, even when a utility patent exists, presumptively indicates a design is *de jure* non-functional. 671 F.2d at 1342 n.3. The majority references *In re Smith* for the proposition that a design patent "does

not, without more, bestow upon said device the aura of distinctiveness or recognition as a trademark." *In re Smith*, 734 F.2d at 1485 (quoting *In re Honeywell Inc.*, 187 U.S.P.Q. 576, 578 (T.T.A.B. 1975)). However, the same case also notes that "[e]vidence of distinctiveness is of no avail to counter a de jure functionality rejection." *Id.* at 1484-85. Also, even *In re Smith* states that "[t]he existence of a design patent may be some evidence of non-functionality." *Id.* at 1485.

Further, the Board and the majority wholly disregarded the evidence submitted by BD of alternative designs utilized by BD's competitors. The majority is correct that there is no need to consider alternative designs when functionality has been established, Maj. Op. at 15; however, "that does not mean that the availability of alternative designs cannot be a legitimate source of evidence to determine whether a feature is functional in the first place." *Valu Eng'g*, 278 F.3d at 1276. In this case, the Board disregarded two alternative designs—designs actually used by BD's competitors—because it found that they shared the same utilitarian features and were therefore not "alternative designs." *See* Maj. Op. at 15. The disqualification of an alternative design because it shares the same utilitarian features is unsupported by law. *See Morton-Norwich*, 671 F.2d at 1342 ("[C]ompetitors may even copy and enjoy all of [the design's] *functions* without copying the external appearance of appellant's spray top." (emphasis added)). In fact, this evidence strongly suggests that BD's design is not functional because BD faces competition from products with similar functionality, yet differing designs. As in *Morton-Norwich*, BD's "[c]ompetitors have apparently had no need to simulate" BD's product design "in order to enjoy all of the *functional* aspects" of a closure cap. *Id.* at 1342 (emphasis in original). Any concern that BD will unfairly assert its mark against these competitors rings hollow

when BD, in seeking protection of this mark, has already distinguished those designs of its competitors.

Finally, the Board may not ignore the fourth *Morton-Norwich* factor—whether the design results from a less expensive method of manufacture—when evidence was presented on it. There were undisputed statements from BD indicating that the design did not result from reduced costs of manufacture. This uncontroverted evidence should have been taken into consideration in the Board's weighing of the factors. While the majority characterizes this as "little record evidence," Maj. Op. at 15, it is evidence that must be considered nonetheless.

Because the Board committed legal error in failing to analyze the functionality of BD's mark as a whole and lacked substantial evidence for its findings, I would reverse the Board's decision on functionality. On the functionality determination, I therefore respectfully dissent.

Because the Board's analysis of acquired distinctiveness was influenced in material respects by its legally erroneous finding of functionality, *see Board Opinion*, 2010 WL 3164746, at *9, I would vacate that portion of the Board's opinion and remand for reconsideration.