THIS OPINION IS A
**PRECEDENT OF THE
T.T.A.B.**

Mailed:
January 14, 2013

**UNITED STATES PATENT AND TRADEMARK OFFICE**

————————

**Trademark Trial and Appeal Board**

————————

In re Mars, Inc.

————————

Serial No. 77545810

————————

Cristina A. Carvalho, Jason J. Mazur, and Loni J. Sherwin of Arent Fox LLP for Mars, Inc.

Heather Biddulph, Trademark Examining Attorney, Law Office 104 (Chris Doninger, Managing Attorney).

————————

Before Seeherman, Zervas and Wellington, Administrative Trademark Judges.

Opinion by Zervas, Administrative Trademark Judge:

Mars, Inc. ("applicant") filed an application (Serial No. 77545810) to register the following configuration of product packaging on the Principal Register for "pet food" in International Class 31:



Applicant claims a bona fide intention to use the mark in commerce pursuant to Trademark Act Section 1(b), 15 U.S.C. § 1051(b); and entered the following description of the mark into the application:

> The mark consists of a three-dimensional configuration of packaging for pet food that consists of a cylindrical, inverted pet food container.  The top of the container is rounded with two concentric ridges that form the inner and outer lip of the top of the container.  The bottom of the container has a wider ridged lip.

The inverted nature of the container is claimed
as a feature of the mark.

The examining attorney finally refused registration on the grounds that (i) the package design is functional and therefore fails to function as a mark, Trademark Act § 2(e)(5), 15 U.S.C. § 1052(e)(5); and (ii) the designation is a nondistinctive package design that is not registrable on the Principal Register without proof of acquired distinctiveness and applicant's application, based on intent-to-use, neither claims nor includes evidence of acquired distinctiveness.  Trademark Act §§ 1, 2, and 45, 15 U.S.C. §§ 1051-1052, 1127.[1]  We address each refusal below.

### *Functionality*

Section 2(e)(5) of the Trademark Act, 15 U.S.C. § 1052(e)(5), provides that registration of a product or package design may be denied if it "comprises any matter that, as a whole, is functional."  A product feature is functional and cannot serve as a trademark "when it is essential to the use or purpose of the device or when it affects the cost or quality of the device."  *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23,

---

[1] The final Office action also included a requirement under Trademark Rule 2.61(b), 37 C.F.R. 2.61(b), that applicant provide certain information to determine whether the mark is functional.

58 USPQ2d 1001, 1006 (2001) (citations omitted). To afford registration to functional designs would inhibit legitimate competition by in effect granting a monopoly to a non-reputational, or nonsource-identifying, feature of a product. *Qualitex Co. v. Jacobson Products Co., Inc.*, 514 U.S. 159, 34 USPQ2d 1161, 1163-64 (1995); *In re Bose Corp.*, 772 F.2d 866, 227 USPQ 1, 6 (Fed. Cir. 1985) ("If the feature asserted to give a product distinctiveness is the best, or at least one, of a few superior designs for its *de facto* purpose, it follows that competition is hindered").

A determination of functionality generally involves consideration of the following factors (known as the *Morton-Norwich* factors):

> 1. Whether a utility patent exists that discloses the utilitarian advantages of the design sought to be registered;
>
> 2. Whether applicant's advertising touts the utilitarian advantages of the design;
>
> 3. Whether alternative designs are available that serve the same utilitarian purpose; and
>
> 4. Whether the design results from a comparatively simple or inexpensive method of manufacture.

See *In re Becton, Dickinson and Co.*, 675 F.3d 1368, 102 USPQ2d 1372, 1377 (Fed. Cir. 2012), citing *In re Morton-*

---

The examining attorney withdrew this refusal in her brief. We therefore give it no further consideration.

*Norwich Products, Inc.*, 671 F.2d 1332, 213 USPQ 9 (CCPA 1982).  These factors are not exclusive, however, for functionality "depends upon the totality of the evidence." *Valu Eng'g, Inc. v. Rexnord Corp.*, 278 F.3d 1268, 61 USPQ2d 1422, 1424 (Fed. Cir. 2002); *Brunswick Corp. v. British Seagull Ltd*., 35 F.3d 1527, 32 USPQ2d 1120, 1122 (Fed. Cir. 1994), *cert. denied*, 514 U.S. 1050 (1995).

**1. Utility patents/technical disclosures.**

The first *Morton-Norwich* factor is whether a utility patent discloses the utilitarian advantages of the design. "[T]he disclosure of a feature in the claims of a utility patent constitute strong evidence of functionality," and "statements in a patent's specification illuminating the purpose served by a design may constitute equally strong evidence of functionality."  *Becton, Dickinson*, 102 USPQ2d at 1377 (citations and internal quotations omitted); *accord Kistner Concrete Products, Inc. v. Contech Arch Technologies, Inc*., 97 USPQ2d 1912, 1920 (TTAB 2011); *In re Dietrich,* 91 USPQ2d 1622, 1627 (TTAB 2009).  Here, we also consider the technical information introduced into the record by the examining attorney and applicant.

Applicant states that "its mark has not been the subject of any design or utility patent or patent application."  Brief at 6.  However, "third-party [utility]

5

patents may be relied upon as evidence; a patent is potentially relevant if it covers the feature at issue, regardless of the owner." *Dietrich*, 91 USPQ2d at 1627, citing *In re Virshup*, 42 USPQ2d 1403, 1405 (TTAB 1997). The examining attorney introduced eight third-party utility patents and one third-party patent application into the record. The disclosures generally pertain to the concentric ridges set forth in the top of the proposed mark and the flared lip at the bottom. (Applicant's description states in part that the "top of the container is rounded with two concentric ridges that form the inner and outer lip of the top of the container.") The following disclosures in four patents appear to be the most relevant.

1. U.S. Patent No. 5,593,063 (the "'063 patent")[2] explains that when closed containers are thermally processed, the contents of the containers expand resulting in an increase in pressure in the container. The side walls of containers are protected from distortion if a flexible annulus – formed by the ridges on the container surface - is used that permits the bottom to bulge outward to increase the container volume.[3] And, if a can is "hot

---

[2] The examining attorney discusses the '063 patent in detail in her brief, thus, presumably, she believes this is the strongest reference to applicant's asserted mark.
[3] We take judicial notice that Merriam-Webster's on-line dictionary (http://merriam-webster.com/dictionary/annulus)

filled," a partial vacuum may develop in the can when cooled which puts the side wall at risk of collapse, unless the flexible annulus returns to its original shape. The use of the annulus increases the contained volume of the can and makes it possible to use thinner container materials while remaining strong enough to heat treat and stack cans on top of one another. Col. 4, lines 12 – 18.

Figure 4 of the patent exhibits a fragmentary section of a can body with a concentric figure recessed inwards toward the body of the can. It depicts can wall "2," peripheral channel portion "5," deformable annulus "6," and central panel "7":



Fig.4

---

defines an "annulus" as a part or structure resembling a ring. The Board may take judicial notice of dictionary definitions, including online dictionaries which exist in printed format. See *In re CyberFinancial.Net Inc.*, 65 USPQ2d 1789 (TTAB 2002). See also *University of Notre Dame du Lac v. J. C. Gourmet Foot Imports Co., Inc.*, 213 USPQ 594 (TTAB 1982), *aff'd*, 703 F.2d 1372, 217 USPQ 505 (Fed. Cir. 1983).

The patent also discloses a stacking feature. Specifically, as shown below in another drawing, a stacking bead (9) is included on the bottom of the can which cooperates with an outwardly directed flange or top (3):



*See also id.* col. 3, lns. 11-16.

2.  U.S. Patent No. 4,522,049 (the "'049 patent") is directed to an aluminum alloy food can body and a method for making the food can body, and discloses the following can configuration, whose bottom is substantially similar to the can top depicted in applicant's alleged mark:



"The food can body has a bottom end wall having a pressure resistant profile form therein and a side wall having an outwardly flanged open end integrally formed with the bottom end wall." Col. 3, lines 54 - 59. The patent states that the invention allows for a reduction in the amount of material needed to manufacture the can, which results in cost savings in the manufacture of the can, col. 9, lines 17 – 32; and explains:

> While a food can design is concerned with an internal pressure and column strength, as is the carbonated beverage can design, the food can design must also accommodate a negative pressure or vacuum within the can body after it is filled, closed and sealed. This concern for a vacuum in many food can uses results from the processing of the filled food cans. High internal vacuums are used in most cans filled with food products. A common method of food packing is to fill and seal the container and then heat the container in a retort, for example, for a specified time. The pressure inside the container increases as the filled food can is heated. A vacuum may result as the can cools after heating which has the effect of exerting an exterior pressure on the can.

Col. 1, lines 53 – 68 – col. 2, lines 1 – 2.

    3. U.S. Patent No. 5,823,040 (the "'040 patent") discloses a method and apparatus for producing a container end wall from a flat metal sheet through a series of concentric beads that are formed within a center portion of the end wall. (We take judicial notice that Merriam-Webster's on-line dictionary (http://merriam-

webster.com/dictionary/bead) defines "bead" as "a projecting rim, band or molding.") The can end "may be used on the top end of a two-piece container and on both the top and bottom ends of a three-piece container." Col. 2, lines 20 – 24. After the beads are formed, the central portion of the disk is moved axially to form an annular countersink. This construction permits the thickness of the disk to be reduced, while providing for the same or increased buckle strength, thereby significantly reducing the overall cost of the container. Col. 1, lines 40 - 65.

4. U.S. Patent No. 6,702,538 B1 (the "'538 B1 patent") discloses forming a circular metal blank (or a can end) having a periphery and a center panel in which an annular recessed panel is subsequently formed. A goal of the disclosed invention is to minimize warpage of the can end and hence allow the can end to be formed from a relatively thin sheet of metal.

Non-patent literature in the record also discloses that annular recesses on can ends function to adjust can pressures, support strength, and alter container capacity. See, e.g., (i) "Statistical Quality Control in Canning Industry" ("[d]uring the processing cycle, the contents of the filled container, including gas in the head-space and elsewhere, expand and generate an increased pressure within

the can. Some release of the pressure can be accommodated by the concentric expansion beads designed in the end(s)"); and (ii) the "Canadian Metal Can Defects Manual" (cans include "raised or depressed surfaces of the integral end which provide strength or alter the container capacity.").

### (a) The Ridged or Beaded End.

The patents mentioned above disclose various benefits that may result from an annulus formed by a ridged or beaded container end. Specifically, during thermal processing of closed containers, the use of an annulus through ridging or beading of a container end allows the container to tolerate changes in pressure. As a consequence, the walls of the container need not be as thick as walls on containers which do not have ridging or beading. The annulus adjusts depending on temperature and pressure, and provides the container with a greater volume, thereby reducing the pressure within the container. In addition, the beading and ridging has the benefit of limiting or precluding warping of the end of the container, thereby permitting the use of a thinner container end.

Applicant argues that the patents in the record "do not demonstrate the utilitarian advantages of applicant's design." In distinguishing the teachings of the '538 B1 patent, applicant points out that the disclosed invention

pertains to a can end that is <u>subsequently joined</u> to a can body to form a container, unlike applicant's container where the top (i.e., "end") of the container is <u>integrally-formed</u> with the body of the container. Applicant reasons that the patented design is intended to provide structural integrity to a thin can end to prevent warping after it is attached to the body. However, with applicant's design, applicant asserts that "the short stature of the side walls of Applicant's container provides adequate structural support." Brief at 9. Applicant adds that its pet food container is not vacuum-sealed, and concludes that the utilitarian features mentioned in the '538 B1 patent do not demonstrate that applicant's mark is functional.

Applicant is correct in its assertion that the '538 B1 patent is directed to a can end which is to be affixed to a can body. See col. 11, lines 8 - 15. However, other evidence in the record suggests that ridging and beading can also be formed in the end of a can which is integral with the can body. An article from the Canadian Food Inspection Agency entitled "Metal Can Defects" submitted with the November 23, 2009 Office action (at p. 68) discusses the following <u>two-piece</u> can body:

12



The article refers to "panels" (defined as "[r]aised or depressed surfaces of the integral end … [which] provide strength or alter the container capacity"); "countersinks" (defined as "[p]rimarily used to provide strength to the integral end"); and "reinforcement features" (defined as a "series of rings, ridges or parallel lines pressed into the metal of any part of the can body or integral end.") (Emphasis added.)  The article states, "These features provide the metal with additional strength to withstand the stresses of retorting and handling."  In addition, the page from "Food Packaging Technology" accessed through "Google books" submitted at p. 103 of the November 23, 2009 Office action states;

> All ends for processed food cans have a number of circular beads in the centre panel area to

provide flexibility. These allow the panel to move outwards, as internal pressure is generated in the can during the heating cycle of the process and so reduces the ultimate pressure achieved in the can. During the cooling process, this flexibility permits the centre panel to return to its original position. (Emphasis added.)

Further, the '049 patent states that the disclosed invention is "blanked and drawn to form a cylindrical cup having a side wall and a bottom end wall of substantially uniform thickness." Col 3, lines 15 – 20. A "pressure resistant profile" is later formed on the bottom of the cup. Col. 3, lines 55 – 56.

In light of these disclosures, we reject applicant's argument that the patents are distinguishable and not relevant, and find the disclosures of the patents are relevant to the question of the asserted functionality of applicant's alleged mark.

Applicant also argues that the beading and/or ridging are not necessary for the strength of its container because it has a short stature which provides adequate structural support; and that its pet food containers are not vacuum-sealed. Applicant's proposed mark as shown in in its drawing and described in its description, however, is not limited to particular dimensions, material, thicknesses of materials or type of sealing. The ridging of applicant's

14

proposed mark would be necessary for strength and to prevent warpage on cans of a certain thickness, or cans that have applicant's configuration and which are vacuum-sealed. (Nothing in applicant's design precludes vacuum-sealing.) In addition, even if applicant's container does not make use of the ridges and beadings because it is not vacuum sealed, if they are functional on third-party containers, applicant should not be granted a registration that would inhibit third parties from using such ridges and beadings on containers that are vacuum sealed. We therefore are not persuaded by applicant's argument based on the short stature of its container and the fact that its container is not vacuum sealed.

**(b) The Flared Bottom Lip.**

We now turn to the flared, outwardly-extending lip at the bottom of applicant's container, which the examining attorney maintains functions to allow for stacking containers. The top portion of applicant's design includes a top exterior portion which is flush with the wall of the container and appears to be able to sit within the wider ridged lip of the bottom of another such can when the cans are stacked on one another. Although applicant's attorney states at p. 5 of applicant's response to the second Office action that "[t]he ridge at the bottom of the container

15

does not offer any particular benefit in terms of strength, stability, stackability, or sealing," the lip appears to be sized to allow for this stacking feature.

The most pertinent disclosure in the record pertaining to this feature[4] is the disclosure in the '063 patent of a can with a flared top and a container wall with a recession at the opposing bottom. For ease of reference, Figure 4 of the '063 patent is depicted again below:



As mentioned earlier in this opinion in the discussion of this patent, the configuration disclosed in the '063 patent allows the can to be stacked with a second can of the same

---

[4] Although the can depicted in the drawing from the '049 patent, the second of the four patents listed above, bears a strong resemblance to applicant's can, we do not consider the can of the '049 patent to be the most pertinent disclosure. The "flange" in that drawing numbered "34" is intended "to enable double sealing the open end with a suitable can end by double seaming after the can has been filled," col. 3, lines 35 – 37, and is not intended for stacking purposes.

design.  Although we recognize that the patented design is for a container where the walls are recessed inward and which has a smaller lip, while the walls of applicant's container do not appear to have any recession and the container has a larger lip, the principle that having an end that cooperates with a flared lip for stacking purposes applies to both designs.

In response to the examining attorney's inquiry in the April 6, 2009 Office action, "[d]oes the ridge at the bottom of the container offer any benefit (for example a benefit in … stackability …)?", applicant responded on October 7, 2009 that "the ridge at the bottom of the container does not offer any particular benefit in terms of … stackability …."  Also, at p. 2 of its May 24, 2010 request for reconsideration, applicant argued that "[a]ny utilitarian features of the design of Applicant's container are only incidental and serve primarily to identify to consumers that Applicant is the source of the goods."  Applicant also argued that if the primary purpose of the ridges and/or beading at the top of the container were to allow for stacking, one would expect the bottom of the can to be formed with corresponding, interlocking mating feature(s) to permit stacking.  These arguments are immaterial to the functionality analysis of applicant's

particular design.  First, whether applicant's "primary" purpose or intent in settling upon this design was source identification is beside the point.  As *TrafFix* makes clear, only those features which are "<u>merely</u> an ornamental, incidental, or arbitrary aspect of the device" are outside the realm of functionality.  58 USPQ2d at 1005 (emphasis added).  Applicant does not argue that its cans cannot be stacked, and we find these portions of the overall design are not merely ornamental, incidental or arbitrary – their functionality is apparent.  Second, if the lip of a first container rests on the outer ridge of the top of a second container, any need for interlocking mating features of the ridging vanishes.  It is the wider ridged lip at the bottom and the raised outer lip at the top that touch one another; the ridges and/or beading at the top need not engage the bottom of a second container.  Additionally, we note that applicant has not claimed the bottom portion of its design as part of applicant's asserted mark.  Therefore, the bottom of the container may have any configuration, including one where the elements of the bottom of applicant's container do not require the cooperation of the ridging and/or beading elements with any other feature of a second can.

18

Finally, with regard to the inverted nature of applicant's design, the inverted nature of the can does not negate any of the functional aspects of applicant's design, thereby rendering them non-functional.

Thus, in summary, the patents and technical literature show the functional role of the ridges and/or beading of applicant's design, while the stacking benefit of the flared lip at the bottom of applicant's container is clear from not only the '049 patent, but also from the use of a flared lip at the bottom and the raised outer lip at the top that would also allow the stacking of one container on top of another.

## 2. Advertising.

No advertising material has been introduced into the record. As noted above, applicant has based its application on an intent to use, rather than use.

## 3. Alternative Designs.

The availability of alternative designs can, in some cases, be relevant to show that the design sought to be registered "preserves competition by ensuring competitors the right to compete effectively." *Valu Engineering*, 61 USPQ2d at 1428. However, the mere fact that other designs are available does not necessarily mean that applicant's design is not functional. *Bose*, 227 USPQ at 5-6.

In connection with its argument that there are many equivalent designs for pet food containers in the marketplace, applicant submitted samples of containers; "[t]he containers can be circular, oval, square or rectangular; they can be cylindrical cans, pouches, boxes or bags." Brief at 11. Applicant contends that "the many examples of pet food containers in the market, which all serve the same purpose of holding the pet food, demonstrate that there are other designs that work just as well as Applicant's"; and that "there is no competitive need to copy the claimed design features." *Id*.

It appears to us, however, that not all of the pet food containers applicant relies on – circular, oval, square, rectangular, pouches, boxes or bags – are relevant to this factor. It is common knowledge that canned pet food contains wet pet food as opposed to dry pet food, which is typically sold in bags or pouches. Also, it is common knowledge that cans are able to prolong the shelf-life of food products, and therefore the shelf-life of pet food in non-can packaging may not be as long as the shelf life of pet food in cans. In addition, the manufacturing costs for non-circular cans may be greater than the costs of circular cans in view of the opening mechanisms needed for non-circular cans; pull-top openers may be required

because such cans cannot be opened by a simple can opener that cuts along the entire lid.

## 4. Simple or cheap method of manufacture.

In applicant's October 7, 2009 response (¶ 4b), applicant states that its container dimensions are "202 x 109"; that this can is not included on the Can Manufacturers Institute website's list of standard food cans or in CMI's Voluntary Can and End Dimension Reference Manual; and that it is aware of no other pet food container on the market that is the same size as its container. Applicant argues that it could have chosen a "stock" pet food packaging design which is "standard in the marketplace, which would have been an easier and cheaper alternative." October 7, 2009 response at p. 5. It concludes that the applied-for product packaging confers no economic benefit on applicant.

Applicant presumes that any "stock" can is simpler or cheaper to manufacture than a container with applicant's design, simply because it is a "stock" can. Applicant's argument says nothing about the simplicity of manufacture or costs of manufacturing each container, but is based on production volumes. The argument tells us nothing about the cost of manufacture if applicant's container becomes a "stock" container. At most, we can conclude only that the

evidence does not show that applicant's configuration results in a cheaper or easier method of manufacture.

**Functionality Analysis--Conclusion**

As required by the statute, we must consider whether applicant's design as a whole is functional. 15 U.S.C. § 1052(e)(5). The patents and technical literature disclose the functional aspects of the ridges and beads found at the top of applicant's applied-for design. The flared lip in applicant's claimed mark, while more exaggerated than the lip of the '063 patent, is sized to permit stacking of containers. This product feature, that is, the exaggerated lip, while not quite the same as that disclosed in the '063 patent, does not cloak applicant's design with any source-identifying characteristics. The Supreme Court in *Qualitex*, 34 USPQ2d at 1165, noted that "[t]he functionality doctrine … protects competitors against a disadvantage (unrelated to recognition or reputation) that trademark protection might otherwise impose, namely their inability reasonably to replicate important non-reputation-related product features." Additionally, Judge Rich noted in *Morton-Norwich* that "the effect on competition 'is really the crux of the matter," and that a balance must be struck "between the 'right to copy' and the right to protect one's method

22

of trade identification." *Morton-Norwich,* 213 USPQ at 15-16. Based on the evidence, we conclude that competitors would need this flared lip for containers where no modification is made to the sizing of exterior ridging at the opposite end of the can, or where only slight modifications to the exterior ridging exists. To afford registration to applicant's design would inhibit legitimate competition by in effect granting a monopoly to what is essentially a very basic design for an inverted can. The refusal to register under Section 2(e)(5) is therefore affirmed.

### *Inherent Distinctiveness*

Although our finding that the proposed mark is functional is a sufficient basis for affirming the refusal of registration, in order to render a complete opinion we turn to the second ground for refusal, namely, that applicant's mark is not inherently distinctive. Product packaging may be inherently distinctive and registrable on the Principal Register if its intrinsic nature serves to identify a particular source. *Wal-Mart Stores, Inc. v. Samara Bros., Inc.,* 529 U.S. 205, 54 USPQ2d 1065 (2000); *Two Pesos, Inc. v. Taco Cabana, Inc*., 505 U.S. 763, 23 USPQ2d 1081 (1992). "[U]ltimately 'the focus of the [inherent distinctiveness] inquiry is whether or not the

23

trade dress is of such a design that a buyer will immediately rely on it to differentiate the product from those of competing manufacturers; if so, it is inherently distinctive."'  *In re Chippendales USA, Inc.*, 622 F.3d 1346, 96 USPQ2d 1681, 1685 (Fed. Cir. 2010), quoting *Tone Brothers, Inc. v. Sysco Corp.*, 28 F.3d 1192, 31 USPQ2d 1321 (Fed. Cir. 1994).  The issue before us, then, is whether the subject matter sought to be registered can function independently of any words as a trademark to identify and distinguish applicant's pet food.  *Seabrook Foods, Inc. v. Bar-Well Foods Ltd.*, 568 F.2d 1342, 196 USPQ 289, 291 (CCPA 1977).  In determining whether a design is distinctive, the Board considers the following factors:

> 1. Whether the subject matter sought to be registered is a "common" basic shape or design;
>
> 2. Whether the subject matter sought to be registered is unique or unusual in a particular field;
>
> 3. Whether the subject matter sought to be registered is a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods viewed by the public as a dress or ornamentation for the goods; or
>
> 4. Whether the subject matter sought to be registered is capable of creating a commercial impression distinct from the accompanying words.

*Seabrook Foods*, 196 USPQ at 291.  See also *Chippendales*, 96 USPQ2d at 1684.  The fourth factor, whether the trade dress

is capable of creating a commercial impression distinct from the accompanying words, is not applicable.

## A. Whether applicant's container is a "common" basic shape?

"The first *Seabrook* factor essentially asks whether the trade dress is common generally: for example, does it employ a basic shape or design such as a letter or geometric shape?" *Chippendales*, 96 USPQ2d at 1687.

The Examining Attorney submitted depictions of various cans taken from various websites to support her contention that the subject matter sought to be registered is a common, basic shape. The containers set forth below are representative.

from vogel-noot.com:[5]                    from lowsodiumcatfood.com:

          

from ballamericas.com:



from ehcan.com:



from jwbasecamp.com (both):





Additionally, the examining attorney submitted photographs of several pet food cans for different brands that have substantially the same ridging and/or beading

---

[5] Identified as a two-piece can.

depicted in applicant's design, as well as smooth sides and a flared lip on one end.[6]  See, e.g.:

● "Fancy Feast" (p. 10, denial of request for reconsideration):



● "Wellness" (p. 40 and 41, denial of request for reconsideration):



---

[6] According to the October 18, 2010 Office action, the photographs were taken at PetSmart in Alexandria, Virginia.



● "Science Diet" (p. 44, denial of request for reconsideration):



We find that the examining attorney has established that applicant's mark is a common basic shape, as evidenced by the many can configurations in the record, including cans for pet food. Applicant's design contains the same ridging or beading found on one end of some cans and the same type of flared lip on the opposite end. The cylindrical walls of applicant's design are smooth, as are those of other designs. We acknowledge that applicant's mark does not have the recessed edge that some, but not

all, of the third-party cans have.  However, the recession
on these cans is very slight, and two of the cans, the
vogel-noot.com can and the can on the far right of the
photograph from ehcan.com, do not appear to have
recessions.  The height-to-width proportions of applicant's
design are not so unusual to render the shape "uncommon."

Applicant argues that "[n]one [of the third party
containers] contain the combination of unique features
found in Applicant's mark, such as the wider ridged lip
combined with the smaller size and inverted nature."  Brief
at 13.  Also, applicant submitted the following photograph
to highlight differences between its container – which
appears to be metal - and other particular pet food cans:



However, the features of applicant's design are not so
distinctive when third-party containers are inverted and
compared to applicant's container.  They share many of the
same features.  Additionally, the photographs containing
applicant's container juxtaposed with other pet food

29

containers are not particularly persuasive because they only contrast applicant's container and one style of can. (It also appears to us that the comparison is not apt because the third-party cans include labels, while applicant's container does not.)  Further, applicant's argument regarding the specific size of its container is not persuasive because applicant has not claimed that its product packaging has a particular size.  Indeed, the packaging may be of any size; there is no size limitation stated in the description of the proposed mark.

In connection with the inverted nature of applicant's design, the record contains three of applicant's registrations for packaging designs as evidence that inverted shapes have been registered for pet food containers.  Registration Nos. 2052069 and 2052071, submitted as Exhibit 1 to applicant's October 7, 2009 response, both for the mark



recite "dog food" and "cat food," respectively.  Both registrations issued under the provisions of Section 2(f). The very fact that these designs were registered under

30

Section 2(f) shows that the marks are not inherently distinctive. See *Yamaha International Corp. v. Hoshino Gakki Co. Ltd.*, 840 F.2d 1572, 6 USPQ2d 1001, 1005 (Fed. Cir. 1988). Thus, these registrations do not support applicant's position that its alleged mark is inherently distinctive. The third registration, submitted by applicant with its February 26, 2009 response, is Registration No. 3220575 for the mark



for "pet food." Section 2(f) was not claimed. However, the mark which is the subject of this registration is considerably different from the design in the present application and, as opposed to the relatively common shape of applicant's proposed mark, the registered design has the appearance of a serving cloche, which is an unusual design for a pet food container.

Applicant also points to two third-party registrations for marks consisting of container configurations shown in inverted form, which have registered on the Principal Register without a claim of acquired distinctiveness.

Based on these registrations, applicant argues that inverted containers (with an opening on the bottom) are registrable. Insofar as the third-party registrations are concerned, the Board has often noted that each case must be decided on its own merits. The determination of registrability of those particular marks by the examining attorneys cannot control our decision in the case now before us. See *In re Nett Designs Inc*., 236 F.3d 1339, 57 USPQ2d 1564, 1566 (Fed. Cir. 2001). ("Even if some prior registrations had some characteristics similar to [applicant's application], the PTO's allowance of such prior registrations does not bind the Board or this court."). Further, the goods involved in the two registrations (which include polishes, creams and pigmented dressing for footwear and leather goods) are unrelated to applicant's goods and the claimed designs are substantially different from applicant's design and indeed, claim colors as well. Simply because they have an inverted configuration and are registered on the Principal Register without a claim of acquired distinctiveness does not mean that applicant's mark should also be registered.

In our opinion, the shape or design remains common even if it is inverted, as compared to other pet food containers; the design simply has the appearance of an

32

upside down container.  Therefore, we find the shape of applicant's asserted mark to be a common basic shape, and the inversion does not change our finding.

**B. Whether applicant's design is unique or unusual in a particular field?**

The second *Seabrook* factor asks whether the symbol is common in the particular field of use.  *Chippendales*, 96 USPQ2d at 1687.  The evidence reveals that applicant's container design resembles many metal cans used in the pet food field, and is almost identical to some, e.g., the "Science Diet" and the "Fancy Feast" cans, submitted by the examining attorney with the denial of the request for reconsideration, save for the inverted nature of applicant's container.  As for the inversion, as noted above, this feature of the claimed mark does not change the common nature of the shape or design.  As noted above, the design simply has the appearance of an upside down container.

**C. Whether applicant's design is a mere refinement of a commonly-adopted and well-known form of ornamentation for pet food viewed by the public as a dress or ornamentation for the goods.**

The third *Seabrook* factor asks whether or not the mark is a mere refinement of or variation on existing trade dress within the relevant field of use.  *Id*.  In view of the strong similarities applicant's container has to other

non-inverted pet food containers in the record, we find that applicant's inverted container is a mere refinement of a commonly-adopted and well-known form of ornamentation for pet food containers viewed by the public as a packaging dress for the goods.

## Nondistinctiveness Analysis--Conclusion

The record demonstrates that applicant's design is not unique in the sense it has an "original, distinctive, and peculiar appearance." *In re McIlhenny Co*., 278 F.2d 953, 126 USPQ 138, 140 (CCPA 1960), quoting with approval from *Ex parte Haig & Haig, Ltd*., 118 USPQ 229, 230 (Asst. Comm. 1958). In other words, the record demonstrates that applicant's applied-for design is not inherently distinctive or unique. Its extended bottom lip is a minor modification to the flanged lips identified in other cans, the ridging or beading on its top appears in other cans, including pet food cans, and its height to width proportions are unremarkable given the many different sizes and shapes of cans. The inversion of the container is not so exceptional as to render an indistinctive container into an inherently distinctive container. As stated in *In re E S Robbins Corp*., 30 USPQ2d 1540, 1543 (TTAB 1992):

> If the concept of inherent distinctiveness was defined as meaning simply "one and only," then one could obtain a registration for a design

34

which, while "unique" in this sense, differed only slightly from the designs of other competing products and/or containers.  There would be no need that the applied-for design have an "original, distinctive and peculiar appearance" ….

*Decision*: The refusals to register under Trademark Act § 2(e)(5) and under Trademark Act §§ 1, 2 and 45 are affirmed.