THIS OPINION IS A
PRECEDENT OF THE TTAB

Mailed:
February 25, 2013

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

Trademark Trial and Appeal Board
_____

*In re Pohl-Boskamp GmbH & Co. KG*
_____

Serial Nos. 85007428 and 85008626
_____

Phi Lan M. Tinsley of K&L Gates LLP for Pohl-Boskamp GmbH & Co. KG.

Michael P. Keating, Trademark Examining Attorney, Law Office 101 (Ronald R. Sussman, Managing Attorney).
_____

Before Holtzman, Shaw, and Masiello, Administrative Trademark Judges.

Opinion by Masiello, Administrative Trademark Judge:

Pohl-Boskamp GmbH & Co. KG applied to register on the Principal Register two sensory marks for use in connection with "medicines, namely, pharmaceutical formulations of nitroglycerin," in International Class 5. One mark is "the distinctive flavor of peppermint";[1] the other mark is "a peppermint scent."[2]

---

[1] Application Serial No. 85007428, filed on April 6, 2010 under Trademark Act Section 1(a), with a claim of first use of 1924 and first use in commerce of November 19, 1989.

[2] Application Serial No. 85008626, filed on April 7, 2010 under Trademark Act Section 1(a), with a claim of first use of 1924 and first use in commerce of November 19, 1989.

With respect to the *flavor* of peppermint, the trademark examining attorney refused registration under Section 2(e)(5) of the Trademark Act, 15 U.S.C. § 1052(e)(5), on the ground that applicant's proposed mark comprises matter that, as a whole, is functional; and under Trademark Act Sections 1, 2 and 45, 15 U.S.C. §§ 1051, 1052 and 1127, on the ground that the mark does not function as a trademark. With respect to the *scent* of peppermint, the examining attorney refused registration under Trademark Act Sections 1, 2 and 45, 15 U.S.C. §§ 1051, 1052 and 1127, on the ground that the mark does not function as a trademark. When the refusals were made final, applicant filed requests for reconsideration, which were denied. Thereafter, applicant appealed. Applicant and the examining attorney have filed briefs.

1.    Appeals Consolidated.

The two appeals involve common issues of law and fact, inasmuch as both marks have been refused for failure to function as a trademark, and the evidentiary records and arguments presented by applicant and the examining attorney are highly similar. Accordingly, we will decide the appeals in this single opinion. TBMP § 1214 (3rd ed., June 2012.)

2.    Applicant's Goods.

Applicant's product, as shown in product literature made of record by applicant,[3] is a formulation of nitroglycerin marketed by applicant in a spray bottle under the designation "Nitrolingual Pumpspray." The product is described as

---

[3] See samples of product literature submitted with applicant's responses filed January 14, 2011.

"nitroglycerin lingual spray." Applicant's product literature states, "Nitrolingual Pumpspray is indicated for acute relief of an attack or prophylaxis of angina pectoris due to coronary artery disease." "Angina is the chest pain or discomfort that occurs when your heart doesn't get as much blood and oxygen as it needs." Applicant's product "works by relaxing and widening blood vessels so blood can flow more easily to the heart."[4] It is administered by spraying onto or under the user's tongue. The instructions on the Nitrolingual Pumpspray package include the following:

> 5.    Press button firmly with forefinger to release spray onto or under tongue.  DO NOT INHALE SPRAY.
>
> 6.    Release button and close mouth.  Avoid swallowing immediately.  The medication should not be expectorated or the mouth rinsed for 5 to 10 minutes following administration.

The instructions on the package insert are substantively the same, with minor variations of wording.[5]

3.    <u>Flavors and Scents as Trademarks</u>.

Nothing in the Trademark Act precludes the recognition of either a flavor or a scent as a trademark. The Act defines "trademark" as including "any word, name, symbol, or device, or any combination thereof… used by a person … to identify and distinguish his or her goods… from those manufactured or sold by others and to indicate the source of the goods…." Trademark Act Section 45, 15 U.S.C. § 1127.

---

[4] Information regarding Nitrolingual TL from the website <webmd.com> submitted with applicant's requests for reconsideration filed April 4, 2012.

[5] Package and insert filed with applicant's requests for reconsideration filed April 4, 2012.

Regarding this definition, the Supreme Court has noted that "since human beings might use as a 'symbol' or 'device' almost anything at all that is capable of carrying meaning, this language, read literally, is not restrictive." *Qualitex Co. v. Jacobson Products Co.*, 514 U.S. 159, 34 USPQ2d 1161, 1162 (1995).[6]

In an early case, the Supreme Court addressed the question of chocolate flavor as a source-indicator for pharmaceuticals. *William R. Warner & Co. v. Eli Lilly & Co.*, 265 U.S. 526 (1924). There the Court anticipated, to some extent, the standards that currently guide us in a functionality analysis, stating that chocolate "has no therapeutic value; but it supplies the mixture with a quality of palatability for which there is no equally satisfactory substitute," 265 U.S. at 529; and chocolate "serves a substantial and desirable use, which prevents it from being a mere matter of dress. It does not merely serve the incidental use of identifying the respondent's preparation [*citation omitted*] and it is doubtful whether it should be called a nonessential." 265 U.S. at 532. The Board has previously addressed the question of flavor as a mark in *In re N.V. Organon*, 79 USPQ2d 1639 (TTAB 2006), in which registration was refused to "an orange flavor" for antidepressant pharmaceuticals on the ground that it was functional, as the flavor served to mask the otherwise unpleasant taste of the drug.

The Board has previously addressed the question of scent as a trademark in *In re Clarke*, 17 USPQ2d 1238 (TTAB 1990), in which a "floral fragrance reminiscent of Plumeria blossoms" was found registrable for sewing thread and

---

[6] See also Senate Report on the Trademark Law Revision Act of 1988, S.Rep.No. 100-515, at 44, 100th Cong., 2d Sess. (1988).

embroidery yarn. The Board made it clear that it was addressing the use of scent on products that are not ordinarily known to be scented, and not products such as perfumes or scented household products, which are noted for the feature of their fragrance.

4.      Functionality Refusal; Flavor of Peppermint.

We will first address the examining attorney's refusal to register the flavor of peppermint on the ground that it is functional matter. The Supreme Court has stated: "In general terms, a product feature is functional if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 214 USPQ 1, 4 n.10 (1982). A functional feature is one the "exclusive use of [which] would put competitors at a significant non-reputation-related disadvantage." *Qualitex*, 34 USPQ2d at 1164. The Supreme Court confirmed the "*Inwood* formulation" as the "traditional rule" of functionality in *TrafFix Devices Inc. v. Marketing Displays Inc.*, 532 U.S. 23, 58 USPQ2d 1001, 1006 (2001).

The functionality doctrine is intended to encourage legitimate competition by maintaining the proper balance between trademark law and patent law. As the Supreme Court observed in *Qualitex*:

> The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature. It is the province of patent law, not trademark law, to encourage invention by granting inventors a monopoly over new product designs or functions for a limited time, after which competitors are free to use the innovation. If

5

> a product's functional features could be used as trademarks, however, a monopoly over such features could be obtained without regard to whether they qualify as patents and could be extended forever (because trademarks may be renewed in perpetuity).

34 USPQ2d at 1163-64.

The determination of functionality is a question of fact, and depends on the totality of the evidence presented in each particular case. *E.g.*, *Valu Eng'g, Inc. v. Rexnord Corp.*, 278 F.3d 1268, 61 USPQ2d 1422, 1424 (Fed. Cir. 2002); *In re Udor U.S.A. Inc.*, 89 USPQ2d 1978, 1979 (TTAB 2009). The Federal Circuit, our primary reviewing court, looks at the following four factors when it considers the issue of functionality: (1) the existence of a utility patent disclosing the utilitarian advantages of the design; (2) advertising materials in which the originator of the design touts the design's utilitarian advantages; (3) the availability to competitors of functionally equivalent designs; and (4) facts indicating that the design results in a comparatively simple or cheap method of manufacturing the product. *In re Becton, Dickinson and Co.*, 675 F.3d 1368, 1374-1375, 102 USPQ2d 1372, 1377 (Fed. Cir. 2012), *citing Valu Eng'g*, 61 USPQ2d at 1426 and *In re Morton-Norwich Products, Inc.*, 671 F.2d 1332, 213 USPQ 9, 15-16 (CCPA 1982). These well-known "*Morton-Norwich* factors" are "legitimate source[s] of evidence to determine whether a feature is functional." *Valu Eng'g*, 61 USPQ2d at 1427. However, the Supreme Court has made it clear that the standard for functionality is set forth in *Inwood*, *i.e.*, whether a feature is "essential to the use or purpose of the device or… affects the cost or quality of the device," and that if functionality is properly established under *Inwood*, further inquiry into facts that might be revealed by a *Morton-*

*Norwich* analysis will not change the result. *TrafFix*, 58 USPQ2d at 1006 ("Where the design is functional under the *Inwood* formulation there is no need to proceed further to consider if there is a competitive necessity for the feature.").

Addressing the *Morton-Norwich* factors, applicant argues that it "has neither applied for nor registered a utility patent covering its Peppermint Flavor in Connection with Nitroglycerin."[7] The examining attorney does not contest this statement. Applicant states that it does not tout any utilitarian aspect of the peppermint flavor of its product. Indeed, there is no evidence in the record to indicate such touting. Applicant maintains that peppermint oil has no therapeutic properties "in Applicant's nitroglycerin pharmaceuticals," and that the flavor of its goods performs no masking function because nitroglycerin "is generally odorless and tasteless." On this point, applicant has made of record declarations[8] of its Chief Executive Officer and of the Vice President of Sales and Marketing of Shionogi Pharma, Inc., which is the licensed U.S. distributor of Nitrolingual Pumpspray. With one exception,[9] both declarations make identical statements on this topic:

> 10. The use of the Trade Dress[10] in connection with pharmaceutical formulations of nitroglycerin does not

---

[7] Applicant's brief at 4.

[8] Declarations of Marianne Boskamp, applicant's Chief Executive Officer, and Ray Russo, Vice President of Sales and Marketing of Shionogi Pharma, Inc., submitted with applicant's response of January 14, 2011.

[9] Paragraph 11 of the Russo Declaration is prefaced by the words, "To my knowledge,".

[10] Applicant submitted the Boskamp and Russo Declarations in connection with both Serial Nos. 85007428 and 85008626. The term "Trade Dress" is intended to be understood, alternately, to mean either the flavor of applicant's goods or the scent of the goods, as appropriate to the application for which the declaration is considered. In our view this type of conflation likely reduces the precision with which the declarants are able to express themselves.

serve any functional purpose. The Trade Dress does not provide any utilitarian advantage over alternative nitroglycerin pharmaceutical formulations.

11. The Trade Dress does not impart any positive effect to the product. The Trade Dress does not make the product more desirable, effective, or easier to deliver, particularly because pharmaceutical formulations of nitroglycerin typically are odorless and tasteless. Use of other flavors and/or scents in connection with pharmaceutical formulations of nitroglycerin would be equally efficient and/or competitive.[11]

That nitroglycerin is typically odorless and tasteless is not controverted in the record; accordingly, there is no suggestion that applicant's peppermint flavor performs the function of "masking" an unpleasant taste, as was the case in *In re N.V. Organon*, 79 USPQ2d 1639. The testimony of applicant's declarants as to the lack of any pharmaceutical effectiveness of the peppermint oil is corroborated by applicant's packaging, which lists "peppermint oil" among "Inactive ingredients."[12] The record also contains information about applicant's product from the <drugs.com> website, which lists peppermint oil under "List Of Excipients."[13] There is also information regarding a sublingual nitroglycerin spray called NitroMist,[14] and other antianginal drugs marketed as Nifedipine,[15] Adalat,[16] and

---

[11] Boskamp Declaration, ¶¶ 10-11.

[12] Submitted with applicant's request for reconsideration filed April 4, 2012.

[13] An "excipient" is "an inert substance (as gum Arabic, syrup, lanolin or starch) that forms a vehicle (as for a drug or antigen); *esp* : one that in the presence of sufficient liquid imparts to a medicated mixture the adhesive quality needed for the preparation of pills and tablets." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1993) p. 792. In this instance the word appears to have been applied rather loosely to applicant's product, which is not a tablet; however, the reference confirms the characterization of peppermint oil as "inert."

[14] Entry for NitroMist from <dailymed.nlm.nih.gov>, submitted with Office action of October 4, 2011, p. 47; entry for NitroMist from <drugs.com>, "NitroMist Description," and

Procardia;[17] the descriptions of all of them list peppermint oil among "Inactive Ingredients " or "nonmedicinal ingredients," or as "inactive."

Applicant's declarants briefly address the availability to competitors of other "equally effective and/or competitive" flavors.[18] They also indicate that addition of the flavor to applicant's goods "requires additional steps in the manufacturing process to ensure quality control," such that one cannot say that producing flavored product results from "a comparatively simple or inexpensive method of manufacture…."[19]

The examining attorney has the burden of making a *prima facie* showing that the applicant's mark is functional. *In re Becton,* 102 USPQ2d at 1376. The examining attorney notes that applicant's product has a peppermint flavor because it contains peppermint oil, which is listed among the ingredients on applicant's packaging and literature. He argues that peppermint oil is a vasodilator that, when added to nitroglycerine, "has the effect of increasing the rate at which the nitroglycerin is absorbed into the bloodstream of the body."[20] On this point, he has

---

depiction of NitroMist package, submitted with Office action of March 11, 2011, pp. 13 and 20.

[15] Entry for Nifedipine from <medicineonline.com> submitted with Office action of October 4, 2011, p. 49.

[16] Entry for Adalat from <rxmed.com> submitted with Office action of October 4, 2011, p. 46.

[17] Entry for Procardia from <drugs.com> submitted with Office action of October 4, 2011, p. 52.

[18] Boskamp and Russo Declarations, ¶ 11.

[19] Boskamp and Russo Declarations, ¶ 13.

[20] Examining attorney's brief at 6.

submitted evidence to show that in the field of herbal remedies and alternative medicine, peppermint is regarded as having vasodilative properties.[21] In the present context, we give evidence relating to herbal remedies and alternative medicine very limited weight. In the field of prescription pharmaceuticals, the legal and professional standards of efficacy are high. What might be touted as a functional feature in a herbal remedy might be considered ineffective in a prescription pharmaceutical. In fact, applicant and others who utilize peppermint oil in pharmaceuticals have listed the oil as an inactive ingredient.

The examining attorney notes that several other medications that are designed to treat angina pectoris (the nitroglycerin spray NitroMist, as well as Nifedipine, Adalat and Procardia) contain peppermint flavor; however, as we have noted above, peppermint oil is an inactive ingredient in those preparations.

More to the point, the examining attorney has made of record information relating to U.S. Patent No. 6559180, issued May 6, 2003.[22] The Background and Summary sections of that patent contain the following statements:

> Nitroglycerin (NTG) is the most common medication taken for quickly alleviating the pain experienced by someone having an angina attack.
>
> …

---

[21] Cached materials from <itmonline.org>; and materials from <naturesflavors.com>, submitted with the Office action of July 14, 2010, pp. 30-38 and 55-56. See also materials submitted with Office action of October 4, 2011, pp. 24-38.

[22] See Office action of October 4, 2011. A third-party utility patent may be relied upon as evidence if it covers the feature at issue, regardless of who owns it. *In re Virshup*, 42 USPQ2d 1403, 1405 (TTAB 1997); *see also In re Dietrich*, 91 USPQ2d 1622 (TTAB 2009).

NTG is commonly supplied in tablet or liquid form for sublingual delivery. Typically, in liquid form, a pump spray applicator is used and is set to deliver 400 mcg NTG per single spray dosage. It is known in the prior art to add peppermint oil as an inactive ingredient to NTG in the liquid form for sublingual delivery.

…

It has been discovered that the use of menthol containing substances (MCS), when used in conjunction with NTG can potentiate the effect of NTG when it is administered to a patient sublingually. Accordingly, MCS permits the usage of a lower minimal effective NTG dosage. In other words, a mixture of MCS with a less than the 400 mcg standard dosage of NTG will provide the same effect as a standard 400 mcg dosage of NTG.

As used in this specification, MCS is used to collectively refer to substances from which Menthol is derived. Substances which are considered to be MCS include peppermint oils, (Ex Mentha Piperita and Ex Mentha Arvensis), peppermint flavor, spearmint oil, or synthetically produced Menthol.

The Detailed Description section of the patent describes the results of two studies in which the nitroglycerin used was Nitrolingual Pumpspray. According to the patent, the combination of menthol-containing substances with nitroglycerin not only reduces the needed dosage of nitroglycerin, but also reduces the typical side effects of nitroglycerin, namely, headache and fainting. On the basis of this patent, the examining attorney argues that "Because the peppermint makes the product work more effectively, applicant would have a clear competitive advantage over competing products that do not possess the peppermint flavor."[23]

---

[23] Examining attorney's brief at 9.

Patent No. 6559180 provides evidence that, even though peppermint oil is inactive as used in Nitrolingual Pumpspray, if used in connection with nitroglycerin in certain proportions peppermint oil could improve the effectiveness of sublingual nitroglycerin spray. This evidence is sufficient to meet the examining attorney's burden of showing that the proposed mark is functional. It demonstrates, *prima facie*, that competitors of applicant might seek to improve upon sublingual nitroglycerin spray by the addition of peppermint oil as a therapeutic ingredient; and that if applicant were to have the exclusive right to offer nitroglycerin spray that tastes of peppermint oil, it "would put competitors at a significant non-reputation-related disadvantage," *Qualitex*, 34 USPQ2d at 1164, because competitors would either have to forego using peppermint oil or find a way to mask the taste of the peppermint oil, if that were even possible.

Applicant argues that "The cited patent pertains to the interaction between menthol (versus peppermint oil) and nitroglycerin. Menthol is not the subject of this application. … Given the inert and non-functional qualities of peppermint oil, there are innumerable flavor alternatives that are and would be just as efficient and equally as competitive."[24] However, to argue that the patent relates to menthol, not peppermint, does not sufficiently rebut this showing. Menthol is:

> A secondary terpenoid alcohol $C_{10}H_{19}OH$ that is known in 12 optically isomeric forms including (1) a crystalline levorotatory form *that has the odor and cooling properties of peppermint, that occurs naturally esp. in peppermint oil* and Japanese mint oil as the principal constituent….

---

[24] Applicant's brief at 6.

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1993) p. 1411 (emphasis supplied).[25]  Moreover, it is clear from the language of the patent quoted above that the term "menthol containing substances" includes "peppermint oils."  Peppermint oils, in turn, impart a peppermint flavor.  Peppermint oil is:

> An oil that has a strong peppermint odor and produces a cooling sensation in the mouth, is *obtained from peppermint*, and is used chiefly as a *flavoring agent* and as a carminative.

*Id*. at p. 1674 (emphasis supplied).

It is apparent that if competitors of applicant wish to improve their products by the addition of peppermint oil (as a therapeutic agent) according to the method disclosed in the patent, those products would include, to some extent, a peppermint flavor that could infringe upon the trademark rights that applicant claims, unless such competitors were to go to the additional expense of masking the peppermint flavor.[26]  If for any reason the benefit of peppermint oil disclosed in the patent is fallacious or if the practice of the invention would not result in a product having peppermint flavor, it was incumbent upon applicant to so demonstrate.  The explanation offered in applicant's brief does not do so.

---

[25] The Board may take judicial notice of dictionary definitions, *Univ. of Notre Dame du Lac v. J.C. Gourmet Food Imp. Co.*, 213 USPQ 594 (TTAB 1982), *aff'd*, 703 F.2d 1372, 217 USPQ 505 (Fed. Cir. 1983).

[26] *Cf. TraFix Devices*, 58 USPQ2d at 1007 ("Because the dual-spring design is functional, it is unnecessary for competitors to explore designs to hide the springs, say by using a box or framework to cover them, as suggested by the Court of Appeals.  The dual-spring design assures the user the device will work.  If buyers are assured the product serves its purpose by seeing the operative mechanism that in itself serves an important market need.  It would be at cross-purposes to those objectives, and something of a paradox, were we to require the manufacturer to conceal the very item the user seeks.")

Nor do the Boskamp and Russo declarations sufficiently rebut the examining attorney's showing. Although they indicate that the "Trade Dress" of applicant's goods (meaning, in this case, the peppermint flavor) "does not serve any functional purpose" (because it is an inactive ingredient), they do not squarely meet the issue raised by the cited patent, namely, whether peppermint flavor could be an essential feature of other nitroglycerin medications made under different formulas, in which peppermint oil may be included as a therapeutic agent. Neither do we find a sufficient rebuttal of the examining attorney's position elsewhere in the record. Inasmuch as the present record indicates that peppermint oil has therapeutic properties in applicant's field of goods, to allow applicant the exclusive right to market nitroglycerine formulations having the flavor of peppermint oil would impermissibly prevent the future use of therapeutic peppermint oil by others in applicant's field. This would frustrate the policies expressed in *Qualitex*, 34 USPQ2d at 1163-64. *See also Elmer v. ICC Fabricating Inc.*, 36 USPQ2d 1417 (Fed. Cir. 1995):

> [P]atent law, not trade dress law, is the principal means for providing exclusive rights in useful product features. … [O]nce the … patent expires, the public will be entitled to practice the invention claimed in the patent. *See Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 165 [9 USPQ2d 1847] (1989) ("For almost 100 years it has been well established that in the case of an expired patent, the federal patent laws *do* create a federal right to 'copy and use.'");… Enforcing a 'trade dress' right defined, as it was here, to be essentially coextensive with, and in fact broader than, [the] patent would frustrate that right because trade dress protection may last indefinitely and thus competitors could not effectively 'copy and use' the invention after the patent expires."

36 USPQ2d at 1423 (emphasis in original).

The record before us indicates that peppermint oil imparts a flavor of peppermint to substances to which it is added, and potentiates the effect of nitroglycerin. Thus, peppermint oil "affects… the quality" of nitroglycerin within the *Inwood* definition of functionality. Accordingly, we find that applicant's proposed mark, the flavor of peppermint, is functional within the meaning of Trademark Act Section 2(e)(5), 15 U.S.C. § 1052(e)(5).

5.     <u>Failure to Function as a Mark: Flavor of Peppermint; Scent of Peppermint</u>.

We next address the examining attorney's refusal to register both of applicant's marks -- the flavor of peppermint in one case (assuming for purposes of this refusal that the mark is not functional), and the scent of peppermint in the other -- on the ground that such marks do not function as trademarks to identify and distinguish applicant's goods from those of others and to indicate the source of applicant's goods, under Trademark Act Sections 1 and 45, 15 U.S.C. §§ 1051 and 1127.

The Board has observed that both flavor and scent should be treated according to the rule applicable to product designs: "Because flavor is generally seen as a characteristic of the goods, rather than as a trademark, a flavor, just as in the cases of color and scent, can never be inherently distinctive." *In re N.V. Organon*, 79 USPQ2d at 1650. In so stating, the Board was following the Supreme Court's guidance with respect to product designs:

> In the case of product design, as in the case of color, we
> think consumer predisposition to equate the feature with

> the source does not exist. Consumers are aware of the reality that, almost invariably, even the most unusual of product designs – such as a cocktail shaker shaped like a penguin – is intended not to identify source, but to render the product itself more useful or more appealing.

*Wal-Mart Stores, Inc. v. Samara Brothers*, 529 U.S. 205, 54 USPQ2d 1065, 1069 (2000). The critical question before us is whether the flavor and scent sought to be registered would be perceived as source indicators or merely as physical attributes of applicant's pharmaceutical product. The rule of *Wal-Mart* and the logic underlying it are directly and forcefully pertinent to the case at hand.

A "substantial showing of acquired distinctiveness" is required to demonstrate that a flavor or scent functions as a mark. *In re N.V. Organon* at 1650. Moreover, "the evidence required is in proportion to the degree of nondistinctiveness of the mark at issue." *Nextel Communications, Inc. v. Motorola, Inc.*, 91 USPQ2d 1393, 1401 (TTAB 2009); *see also In re Owens-Corning Fiberglas Corp.*, 774 F.2d 1116, 227 USPQ 417, 424 (Fed. Cir. 1985). Accordingly, applicant's burden of showing acquired distinctiveness is a heavy one.

In support of applicant's claim that its marks have acquired distinctiveness as source indicators, applicant argues that it has used the marks in U.S. commerce since 1989, and that such use was "substantially exclusive."[27] Applicant admits, however, that there is currently "one other user of a peppermint flavor with nitroglycerin pharmaceuticals in the United States."[28] Applicant instituted a law suit against that user, but that suit was subsequently settled. Applicant has not

---

[27] Applicant's brief (85007428) at 8.

[28] *Id.*

16

disclosed the terms of settlement, but the clear import of applicant's statement in its brief is that this third-party product is still available in the market.[29]  Applicant admits that the same third-party product also has a  peppermint scent.[30]  The product in question is NitroMist nitroglycerin lingual aerosol, a product that apparently competes directly with applicant's goods.[31]  Applicant argues that, since 1989, applicant's product has had great sales success in the United States, that it has made great expenditures on advertising and promotional efforts, and that applicant's flavor and scent marks have acquired recognition, as demonstrated by declarations of 23 physicians and pharmacists.

The examining attorney generally criticizes the sufficiency of the applicant's evidence of acquired distinctiveness.  He also contends that the pharmaceutical NitroMist is not the only exception to applicant's purported exclusivity in the marketplace, and argues that pharmaceutical "vasodilators similar to applicant's Nitrolingual® formulation commonly contain peppermint oil and thus possess a peppermint flavor,"[32] among which he has named Nifedipine, Procardia and Adalat. He contends that such third-party vasodilators also have a peppermint scent.[33]

The period of time during which applicant has used its proposed marks is substantial.  However, this factor is undercut by the lack of exclusivity.  Applicant

---

[29] There is nothing in the record to suggest that this third-party's continuing use of peppermint flavor is governed by a license running from applicant.

[30] Applicant's brief (85008626) at 4.

[31] See materials supplied with applicant's request for reconsideration of April 4, 2012.

[32] Examining attorney's brief (85007428) at 11.

[33] Examining attorney's brief (85008626) at 9.

admits that a directly competing product, having a peppermint flavor and scent, is in the market. There is also evidence of other anti-anginal preparations containing peppermint oil being marketed under the names Nifedipine, Procardia, and Adalat.[34] Although the record shows that these three products are not nitroglycerine preparations, we find them relevant inasmuch as they are, like applicant's goods, for the treatment of angina pectoris, and their presence in the market suggests that peppermint flavors and scents are not unknown in the applicant's general market area. The presence of other flavored and scented pharmaceuticals in the market is likely to reinforce consumers' perception of the flavor and scent of applicant's goods as mere physical attributes of the product, rather than as indicators of the product's source.

The advertising materials that applicant has made of record do not in any way promote either the flavor or the scent of applicant's goods as an indicator of source. In fact, they contain no more than passing references to a peppermint flavor and scent. We note that the list of ingredients, presented in small print, on applicant's package includes "peppermint oil."[35] We note also that applicant's website and one print advertisement do include, in small print, trademark claims.[36] The claim on the print advertisement reads as follows:

> The following trademarks are either registered trademarks or trademarks of Pohl-Boskamp in the United

---

[34] We have not considered evidence of the products called Mylan-Nitro, Suscard, and Rho-Nitro, as the products appear to be sold abroad and therefore consumers in the United States are unlikely to be aware of them and of their scent and taste.

[35] Submitted with applicant's request for reconsideration filed April 4, 2012.

[36] *Id.*

> States and/or other countries: Pohl-Boskamp word mark;
> Pohl-Boskamp logo; Nitrolingual word mark; Peppermint
> flavor of nitroglycerin; Peppermint scent of nitroglycerin;
> Nitrolingual Pumpspray shapes; Nitrolingual Pumpspray
> colors; and the sound of Nitrolingual Pumpspray.

In view of the inconspicuous placement, the legalistic tone and the plethora of claimed marks, it is unlikely that these notices would have substantial impact on applicant's customers. We give advertising of this sort little weight for purposes of demonstrating customer perceptions of the proposed marks. An otherwise unregistrable flavor or scent is not transformed into a trademark by the mere assertion or claim that it is one. *In re Remington Products Inc.*, 3 USPQ2d 1714, 1715 (TTAB 1987); *see also Plastilite Corp. v. Kassnar Imports*, 508 F.2d 824, 184 USPQ 348, 350 (CCPA 1975) ("Appellant emphasizes that its intent in adopting the yellow-orange color scheme was for this to function as a trademark . . . . However, it is the association of the mark with a particular source by the ultimate consumers which is to be measured -- not appellant's intent." (Citation omitted)).

With respect to promotional efforts and sales success, applicant's two declarants attest as follows:

> 16. Since 1999, Applicant and its licensed U.S.
> distributor have spent approximately 100 million dollars
> (one hundred million) on the marketing and promotion of
> the goods that bear the Trade Dress.

> 17. Since 1999, the approximate total combined
> revenue of Applicant and its licensed U.S. distributor
> from the sale of the goods bearing the Trade Dress is
> approximately 200 million (two hundred million) dollars.

> 18. Since 1999, Applicant and its licensed U.S. distributor have sold approximately 5 million (five million) units of the goods bearing the Trade Dress.[37]

These declarations convey only a very equivocal picture of the market recognition of applicant's marks in the United States. The figures stated in these declarations relate to a period of approximately 12 years and combine the performance of applicant's U.S. distributor and applicant itself. Considering that applicant's sales have not been limited to the United States but have also been made "in at least Canada, the United Kingdom, the Benelux region, Germany, Austria, Australia and New Zealand,"[38] it is impossible to determine what portions of these figures relate to the United States, which is the only relevant marketplace for purposes of our inquiry. Moreover, the figures for promotional expenditures relate not specifically to promotion of the marks themselves, but to promotion of "goods bearing" the marks. As all of the advertising materials of record show virtually no promotion of the marks themselves, we cannot conclude that the marketing and promotional expenditures described in the declarations have affected the market recognition of the asserted marks.

In order to demonstrate customer recognition of its marks, applicant has submitted testimonials of 23 physicians and pharmacists.[39] As the examining attorney notes, they are largely identical to each other, such that it is clear that they are not expressed in each declarant's own words. Notably, each testimonial

---

[37] Boskamp and Russo Declarations, ¶¶ 16-18.

[38] Applicant's brief (85007428) at 9.

[39] Submitted with applicant's responses of January 14, 2011.

addresses numerous types of trade dress associated with the Nitrolingual Pumpspray product: four bottle shapes, the color scheme, the peppermint flavor, the peppermint scent, the "touch and feel" of the bottle, and the sound of the pumpspray bottle. Each declarant asserts that each of these many types of trade dress is distinctive in the marketplace. With respect to flavor and scent, the typical declarant states as follows:

> I am very familiar with the peppermint flavor used in connection with Pohl-Boskamp's pharmaceutical formulations of nitroglycerin, which is unique compared to other pharmaceutical formulations of nitroglycerin currently on the market because other formulations lack a peppermint flavor (or any flavor at all).

> I am very familiar with the peppermint scent of Pohl-Boskamp's pharmaceutical formulations of nitroglycerin, which is unique compared to other pharmaceutical formulations of nitroglycerin because currently there are no other formulations of nitroglycerin on the market that have a peppermint scent, and other formulations of nitroglycerin currently are odorless. When I encounter the scent of peppermint in connection with pharmaceutical formulations of nitroglycerin, I associate the scent with Nitrolingual® Pumpspray, and no one else.

The examining attorney objects that end users of the applicant's goods are not represented among the declarants.[40] While the views of end users would be beneficial, the views of physicians who select the pharmaceuticals for the use of their patients are certainly relevant to the question of acquired distinctiveness.

The testimonials are remarkable for their effort to say so much about so many different things in so few words. The declarants' willingness to vouch for the

---

[40] Examining attorney's brief (85007428) at 17.

distinctiveness of so many of applicant's elements of trade dress affects the persuasiveness of these statements.

The testimonials do not squarely address the relevant questions before us. For example, to say that the flavor or scent of applicant's product is "unique compared to other pharmaceutical formulations *of nitroglycerin*" skirts an issue that arises in the record, namely, whether other related products (such as other angina remedies that are not formulations of nitroglycerin) may also be flavored or scented with peppermint. If other medicines or even other over-the-counter remedies of various types are flavored or scented with peppermint, it would reduce the likelihood that applicant's flavor would be perceived as a source indicator, rather than as a feature of the product. As the examining attorney has shown, other anti-anginal preparations are flavored and scented with peppermint.

Similarly, to state that "When I encounter the scent of peppermint in connection with pharmaceutical formulations *of nitroglycerin*, I associate the scent with [applicant]" stops short of answering a more relevant question: if the declarant encountered the scent of peppermint in connection with a different heart remedy, such as a calcium channel blocker, would he associate it with applicant? The probative weight to be given the declarations is also reduced because, as the examining attorney notes, the statement that applicant's scent and flavor are unique in the field of nitroglycerin "because currently there are no other [peppermint scented or flavored] formulations of nitroglycerin on the market" is

22

contradicted in the record: the NitroMist product, flavored and scented with peppermint oil, is present in the marketplace, according to applicant's brief.

Finally, the probative weight of the testimonials is affected somewhat by the fact that they are all essentially identical in form and were clearly not composed individually. Although form statements may be used as evidence of acquired distinctiveness, *In re Lorillard Licensing Co.*, 99 USPQ2d 1312 (TTAB 2012), such statements are less persuasive than statements expressed in the declarants' own words. *Cf. In re Pacer Tech.*, 338 F.3d 1348, 67 USPQ2d 1629, 1633 (Fed. Cir. 2003) (Where multiple affidavits are "nearly identical," "conclusorily worded," "fail to explain what it is about Pacer's adhesive container cap that is unique or unusual, or distinctive," and "represent the views of a small segment of the relevant market," "they are not the kind of 'competent evidence' that could carry Pacer's burden of rebutting the PTO's *prima facie* case." (Citation omitted)). While we note the declarants' willingness to sign their names to the precise wording set forth in the statements, we question whether the declarants would fully embrace the proposition for which the testimonials have been put forth, *i.e.*, that each individual element of applicant's trade dress has the power of a trademark, functions to indicate that applicant is the source of the goods, and distinguishes applicant's goods from those of others. Taking the testimonials at their face value, they merely assert that applicant's product is the only one in the marketplace having a peppermint flavor or scent (an assertion that has been controverted); and that each declarant is himself or herself familiar with applicant's product and associates its

scent with applicant alone. (The testimonials do not address whether the declarants associate the flavor of peppermint with applicant alone.)

Most substances that are introduced into the mouth will create sensations of flavor and scent. Consumers are not predisposed to equate either flavor or scent with the source of the product ingested. *Wal-Mart,* 54 USPQ2d at 1069. Rather, they are predisposed to view such features as mere attributes of the product itself. In order to demonstrate that the public has come to perceive either a flavor or a scent as an indicator of the source of the goods, applicant had the heavy burden of producing a very substantial amount of evidence showing that applicant's marketing efforts have overcome the predisposition of which the *Wal-Mart* Court warned. The record lacks evidence of any efforts of applicant specifically directed toward promoting its product's flavor and scent as trademarks. The evidence of sales and promotional expenditures is equivocal in nature. The customer testimonials are not alone sufficient to establish the trademark function of these features of applicant's products. By contrast, evidence showing that peppermint flavor and scent are used by others in the relevant marketplace tends to show that such flavors and scents are more likely to be perceived merely as attributes of ingestible products than as indicators of source. Accordingly, we find that applicant's flavor and scent marks fail to function as trademarks for applicant's goods.

**Decision:** The refusal to register applicant's flavor mark on the ground that it is functional is affirmed. The refusal to register applicant's flavor mark and scent mark on the ground that each of them fails to function as a trademark is affirmed.